All right, the next case we'll hear is United States v. Hicks. And I guess, uh... Miss Skelton, we'll hear from you first whenever you're ready. Morning, Your Honors, may it please the Court, my name is Megan Skelton, and I'm here this morning on behalf of Mary Ann Mendoza. There are four assignments of error in my briefing, Your Honors. I would like to focus on number three, and if I have time, move on to number four, and I will submit on the first two, unless the Court has questions regarding those. Rule 43 mandates that a defendant be physically present at sentencing. But in this case, the District Court heard live victim allocution and denounced that it would use that testimony... I found that argument curious, because you've recast what really happened. The testimony that was used was used during Mr. Hicks' sentencing, right? It was... It was... Testimony from something else, it was not her sentencing. It was adduced at Mr. Hicks' sentencing. Okay, let me just finish, please. It was adduced at Mr. Hicks' sentencing, which was not her sentencing. She had a sentencing, and the transcript was brought into that sentencing, which is a form of hearsay. So the argument has to be that they couldn't have used hearsay, or you had some kind of confrontation right during sentencing. But it's... There's no issue that she was not present during sentencing. She was present during her entire sentencing. The transcript was brought from some other sentencing, which was not her sentencing. To recharacterize that other sentencing as part of her sentencing that she wasn't at is just not a fair way to do it. The right way to do it is, can they use that transcript during the course of her sentencing? And I think that raises a lot of different issues. Your Honor, respectfully, I disagree with the characterization. Your factual recitation is, of course, what happened. Mr. Hicks had his sentencing... Right, and she was at her sentencing, that part you agree with. I do agree she was at her sentencing. But you're arguing she wasn't. So my argument is that when the prosecution asked if it could use the live victim allocution against both Mr. Hicks and Ms. Mendoza, that essentially that became a portion of her sentencing hearing. Not the whole thing. That wasn't... There was a hearing... Not even a portion of it. That was Hicks' sentence. It wasn't even a question mark. She was not entitled to be at Hicks' sentencing, and she was at her own sentencing, and she was never deprived of any part of her own sentencing to be present. The problem you have is that they used that transcript in her sentencing. So Your Honor, there's... And that's why Judge Niemeyer's recitation of your argument is the better one. The question is whether the use of arguably hearsay testimony at her sentencing without her having an opportunity to confront that witness was appropriate. I think... I mean, I understand the argument that Judge Niemeyer made. That's exactly the issue. So Your Honor, I think there's a big difference between the transcript and hearsay and a live victim allocution. It is hearsay, wasn't it? It was hearsay. I mean, the person wasn't in the courtroom? It was hearsay, but the real... And is hearsay allowed at sentencing? Hearsay is allowed at sentencing. That's why you're struggling with this. Well, except that the problem is that a victim's allocution is not like regular evidence. It is emotional. It is in the moment. It is different from the written victim statement that they could have used, which would, of course, also be hearsay. In this case, the judge heard and responded to something physical, emotional, and visceral in deciding what... You know, every sentencing, you know, the parish priest comes in and talks about how this defendant was an altar boy and how all the acolytes liked him and how he was praised and how he's fallen off the deep end. It's all emotional. We hear all that. We hear the schoolteachers talking about the defendants. We hear sisters sending in letters. They're not in the courtroom. In other words, there's a broad exploration about the person and the background to give the sentencing judge a better picture of what's for exercise of discretion. And so I'm not sure the fact it's emotional adds a thing. I mean, maybe you could attack it on hearsay, but I'm not sure where that takes you. Well, the live victim allocution is simply different from the letter from the sister and the transfer. Well, that's why it was used. It was used basically to inform the sentencing. Absolutely, Your Honor, and I think maybe on that point we do agree. And there was a victim who came to Ms. Mendoza's sentence live and testified, and it's very powerful. The trial judge had responded to that evidence and absorbed it, and the allocution had done its job before the transcript was even produced. Counsel, didn't I thought on this one Ms. Mendoza's lawyer expressly agreed to this whole thing? He had no authority to do so. This to be present when... Oh, so this is why you have to argue she wasn't present at her sentencing. If I assume, why don't we just assume for a second I think she was present at her sentencing. If that is the case, then this issue is completely waived, right? Because counsel 100% expressly agreed to the entire procedure. I would say it is not expressly waived because it was something that was a personal right of her own.  Again, I just want you to sort of hypothetically, let's assume she was present at her sentencing. Her lawyer would have been authorized to consent to this procedure. If that is so, then it was consented to and the issue was waived, right? My hearsay is something that an attorney could consent to, that kind of evidentiary objection. But of course, our position is that this was an autonomous right that is not a confrontation right, that she was not there when critical... That's so unconnected to reality. She had one sentencing hearing. She was there at the sentencing hearing and you're objecting to the use of a transcript from some other sentencing hearing at your sentencing hearing. And that's the facts of the case. And I don't know why you keep transforming she wasn't present. She was present during every minute of her sentencing hearing. Your Honor, I understand the court had some concerns about this argument. It's not a concern. I don't see where you're making your argument. It seems to me at some point, you have to recognize that she was never intended to be at the other sentencing. She was denied... She was at her own sentencing hearing and they brought a portion of the other sentencing hearing to hers. And the attorney agreed... Her attorney agreed to that. She's there. And they're all in court. Now you can argue that that shouldn't have happened or it's hearsay or he shouldn't have waived it or whatever. But to argue that she wasn't present at her sentencing, it's like, you know, it's like uh... Alice, I wonder if I can fool them again. We just got to take the facts the way they are and then go from there. I see my time's up. Thank you, Your Honor. Did you have something else you wanted to make? I can give you another minute. I used a little bit of your time here at the end. I appreciate that, Your Honor. I would like to briefly address the fact that the sentence was procedurally unreasonable as well. All right. Why don't you take a minute on that? Ms. Mendoza was sentenced to an above-guideline sentence. The trial judge identified certain factors that gave... That he explained were the basis for it. The loss amount, the number of victims, the nature of the victims, that they were vulnerable human beings instead of corporations or the government. Ironically, that it happened face-to-face instead of over the internet. In fact, what happened here is the judge double-counted factors that were already included into B1.1. B1 includes the loss amount. B2 includes the number of victims. B16 includes the nature of the victims, the fact that they were vulnerable people. So none of those factors were present to an unusual or extraordinary degree that took it outside the heartland. So no upward departure was appropriate in this case. Okay. Thank you very much. All right. Mr. Burnham, we'll hear from you. Good morning, Your Honors. May it please the court. Charles Burnham on behalf of Appellant Willie Lamont Hicks. There are two closely related issues before the court this morning in Mr. Hicks' appeal. One is, did the district court judge err by not raising Mr. Hicks' competency and ordering a competency evaluation? And two, did the district judge compound that error by then allowing Mr. Hicks to represent himself at trial? Before proceeding to the merits of those two issues, and I'll focus mostly on the first because that kind of resolves the second in large part as well, I'll comment briefly on the standard of review because this was given a fair amount of attention in the briefs. To summarize our positions, we think this court's decision in United States versus Bernard was incorrectly decided. With all due respect to the distinguished author of that decision, we agree with the dissent by Chief Judge Diaz. However, even working entirely within the frame of Bernard, particularly as interpreted some years later by this court in United States versus Ziegler, we continue to contend that plain error is not the proper standard of review, that the proper standard is abuse of discretion because Mr. Hicks was not represented by counsel during his ultimate Faretta hearing. He was already going pro se during that hearing. Can I ask you about that? This is where I know you say your two claims very much overlap, but I'm sort of struggling with whether they are separate in this regard because before the Faretta hearing, your client was represented by counsel for about a year. As to his competence, at least maybe not to represent himself, but more generally competency, why couldn't the issue have been raised then when he was represented by counsel? I wasn't present at those hearings. That wasn't me. Theoretically, it could have been, but I don't think that settles the question because as even the Bernard opinion itself recognizes, competency has a temporal element to it where it can change over time. It seems like the argument, I do understand that, but it does seem as though here the argument that is being advanced for why your client was not competent really isn't something that changes over time. There's no allegation that, for instance, there was sort of a mental disorder that grew more pronounced over time. It's just that he has these unusual beliefs about being a more rich citizen, and that seems to have been stable over time. Well, we don't know that, Your Honor. There's no evidence in the record about that, and particularly when you have someone who is detained pretrial, the effect of pretrial incarceration tends to exacerbate any mental health condition, including, as in this case, delusional beliefs. The two prior hearings- Let me ask you something. The Feretta hearing was lengthy. It's almost two hours, I think, or whatever. It was a lengthy hearing, and the court, I didn't count them, but the court kept telling him, you're making a bad judgment. You've got to have counsel. You've got to do this. He said he understood. You're going to get 20 years, I know. You're not as informed. A lawyer will help you, I know. Went through all of that just again and again, totally pushing that, and he insisted that he wanted to represent himself. What if the court had insisted, had said, okay, I think your ideas are pretty kooky. What you're explaining about these things doesn't make much sense to me, and therefore, I don't think you're going to be competent to represent yourself. I'm going to appoint an attorney for you. Then, if it's characteristic of what he showed there and what he showed with his prior counsel, he wouldn't cooperate with his attorney. He probably wouldn't talk to him. He'd probably undermine him and torpedo him, and we'd be up here again saying he didn't get his Feretta right. The judge was in a tough spot on this case, and the judge recognized that the district judge, he spent a lot of time on this. He was very, asked a lot of questions, explored all these ideas. Some of these sovereign citizen ideas really did sound quite quirky and kooky, so to speak. You quoted those in your brief, but there's a lot of other dialogue. I read his cross-examinations of witnesses. His main thesis was whether somebody signed a power of attorney and authorized the conduct. He didn't represent himself to the level of an attorney, obviously, but the question, that isn't the question. I just wonder where this goes if you're right on this. Recall, Your Honor, that we're raising a procedural competency claim, so it's not my burden at this stage before this court to show that Mr. Hicks was, in fact, incompetent. The only question I'm posing is, was there a reasonable cause which would trigger a duty on behalf of the judge to at least investigate the question of competence? The judge recognized he had these ideas, and we see them a lot in this court, the citizen lack a lot of logic, and frankly, they sound sort of kooky. But the dialogue went on and on, and they exchanged ideas. There's no lack of understanding between the two, a lot of questioning, a lot of answers. I must, I agree with you that when your client spoke at, when Mr. Hicks spoke at length about his ideas, they didn't hold together. I mean, it didn't make much sense, but I'm not sure that was indicative of incompetence as much as a decision, ideological decision that he had made for himself. But my whole point is, at the end of, I read the whole transcript, at the end of the transcript, I'm sitting there. Okay, what if it went the other way, and the court ordered counsel? What would be facing? Would you, you'd be standing here, and you would probably be arguing he had a forerunner right. He probably butchered it with counsel. Counsel had a difficulty working with him because he wouldn't talk and with him in anger, maybe even undermine it. We would have had the same type of difficult question, wouldn't we? I'm not sure, your honor, and in this respect, I've somewhat come around to somewhat of the government's view that Indiana versus Edwards from the Supreme Court gives the district judges a certain amount of cover in so-called gray area cases, which perhaps this was, to appoint counsel, and then that's very unlikely to be reversed by this court. But he had backup counsel, didn't he? And he consulted backup. I mean real counsel. Yeah, I know, but the idea that even during, in the transcript, he regularly consulted counsel and spoke with them. We don't know what they said, but he initiated the conversation with counsel and spoke with counsel. Yes, your honor. Can I have maybe 45 more seconds to address? That was you, right? Oh, that was me. Yes, your honor. I'm sorry, I didn't want to speak of you in the third person, but he worked with you, that's right. And he did consult with me extensively. Can I take maybe 45 seconds to address the sovereign citizen points? I think that's very important. There's a lot of cases in this court and in the lower courts about sovereign citizens, flesh and blood, the Morris Nation. And in 90% of them, there's a finding by the district judge that the defendant was being obstructive. A lot of times they come up with these beliefs halfway through the case because someone told them about him in the jail and they're disrespecting the court, trying to just throw sand in the gears. This case is very much not that. Mr. Hicks was very respectful. The report we had, which was submitted at sentencing, found that his beliefs were inextricably intertwined with his mental illness. Because recall that folks that have mental illness, like Mr. Hicks, sometimes glom on to extreme ideologies, aliens, conspiracy theories, extreme political ideologies. And I very much contend that the record here doesn't show your classic sovereign citizen. It shows a profoundly mentally ill man whose fragments of fringe beliefs he picked up along the way were inextricably intertwined with his mental illness that did call his competency into question. And what we're left with, the spooky thing about this case- But nothing during the Peretta hearing, or before or after, anybody suggested that we're talking about mental illness. We were talking about crazy ideas. And the court had no difficulty in communicating with the man. I mean, every question was answered, as you say, respectfully and directly. And he explained how he understood this. The judge many times talked, and you're facing up to 20 years, and this type of thing. And well, I understand what you're saying, though, it's not a frivolous argument. I appreciate that, Your Honor. Yes, sir. Thank you. All right, we'll hear from Ms. Munoz, I guess. Good morning, Your Honors, and may it please the court. MJ Kirsh Munoz here on behalf of the United States. Unless Your Honors have a preference otherwise, I'd like to jump right in and pick up where Judge Niemeyer left off with my colleague on Mr. Hicks' competency related challenges. And I'd specifically like to start by stressing that the standard of review truly does not matter here. The court need not resolve it. Even on abusive discretion review, Mr. Hicks cannot show error in the district court's conduct here. And that's true for almost countless reasons. But taking my cue from how this court typically reviews procedural incompetence claims, there are three buckets of evidence relevant to this inquiry. Number one, a defendant's history of irrational behavior. Number two, his demeanor in court. And number three, prior medical opinions. And all three of these buckets show why the district court had no reasonable cause to order a competency hearing that no one asked for. And where his competency had already been determined at the September 6th FREDA hearing. The court there, of course, found that Mr. Hicks was competent to represent himself. We know that the standard for competency to represent yourself and to stand trial is exactly the same. And so there was really no basis for the district court to revisit that competency finding at any point thereafter. So I'll start by discussing the defendant's, Mr. Hicks, his history of irrational behavior. There is none. In fact, the sophisticated scheme defrauding ordinary, often vulnerable people out of millions of their hard earned dollars, it was a sophisticated scheme. It showed Mr. Hicks' ability to manipulate. The scheme involved numerous corporate entities, aliases, bank accounts, email accounts, as well as elaborate training sessions to convince potential investors. And obviously, Mr. Hicks was an organizer of that scheme. He held control over several of the bank accounts. He directed the activities of his quote unquote disciples. And he occasionally transacted with victims without Ms. Mendoza's assistance. And so that is relevant. I believe that Mr. Hicks claims that that sort of behavior isn't relevant to the competency analysis because it does have this temporal aspect. But as Judge Niermeyer pointed out, there is no indication that there was a mental disorder that devolved over time, such that he was not competent between when he perpetrated this fraud and when he stood trial. Now, of course, Mr. Hicks' demeanor in court was respectful, attentive, cooperative. He followed courtroom rules and procedures. And when I say funny, I'm being soft. They were quite kooky. Yes, your honor, I agree. I think at various points, he said what Judge Easterbrook has called a wacky, wacky references to the sovereign citizen ideology. But your honor, I don't believe that that sort of adherence to to this ideology, in fact, gives rise to a bona fide doubt as to his competency. And that's, of course, what we're being asked to consider here. And of course, you know, as your honors have also noticed, he acquitted himself decently well, actually. Certainly not to the level of a trained attorney. That is not the standard. But he pursued a good faith defense at trial. I didn't knowingly defraud anyone. And oh, by the way, as a factual matter, this wasn't a fraud. It would have worked if my clients had only followed through, if they'd only done exactly, you know, what I had told them. You know, one of these defenses is obviously more viable than the other. But you certainly can't say that Mr. Hicks didn't have a strategy. And the trial record is littered with cross-examination questions, to say nothing of Mr. Hicks' own testimony and his closing argument that pursue these strategies. Your honors, there is simply nothing in the record to suggest a bona fide doubt as to his competence to stand trial. And, you know, as Mr. Burnham has agreed, that question resolves, I think, in large part, the Fredda claim of error. You know, Mr. Hicks, having been found competent to represent himself and to stand trial, the only concerns we have with the Fredda inquiry at that point, is whether it was knowing, intelligent, voluntary, and unequivocal. And I think, you know, the record very much bears out that it, that it was. As Fredda's a strange, strange bird. It's I mean, we have a constitutional right to have counsel. And then we have a constitutional right not to have counsel. And it raises, we've had those issues from time to time. It's, it's not an easy line to draw. Completely agree, Judge Niemeyer. And you're right, that the district court walks a bit of a tightrope when it evaluates these claims. On the one hand, it doesn't want to deprive, you know, the defendant of a Sixth Amendment right to counsel. But of course, that right also encompasses a right to represent yourself. And so, as you point out, we probably would be here if, still, if the district court had denied Mr. Hicks' request to represent himself. But instead it would have been, I was denied, the claim of error would have been, I was denied my right to represent myself. And so, you know, your honor, I think the district court certainly did not err in, in, in its Fredda inquiry and in finding that we will allow you to proceed forward representing yourself. But I will ensure that you have standby counsel. That was previously appointed at one of the magistrate judge's prior attorney inquiry hearings. At the September 6th Fredda inquiry, you know, the district court said, yes, we'll allow you to proceed per se, and you will continue with your standpoint, standby counsel. Unless your honors have any other questions on the competency related challenges, I will switch gears and turn to some of Ms. Mendoza's claims of error on appeal. Now she raises four, but this court has really, she herself and this court has really focused on only two. The first, of course, is the quote, unquote, denial of the right to be present at sentencing. Obviously, the government agrees with how this court has actually viewed this claim. It is not the right to be present at sentencing. It is the, at most, I would say, the right to confront the victims who testified at Mr. Hicks' hearing at Ms. Mendoza's own hearing. But, of course, the confrontation right does not apply at sentencing. And there is really no other, I guess, right that underlies the Rule 43 right to be present at sentencing other than confrontation and, of course, the due process clause. Sentencing courts are permitted to consider the widest breadth of information about a defendant when determining his punishment. This, of course, includes victim impact statements, whether they be in written form or have been allocated at a prior hearing. So the court was entitled to consider what they had to offer for the purpose of imposing an appropriate sentence. As I alluded to, the only limitation on accepting information that is otherwise authorized to be considered at sentencing is the due process requirement that it be sufficiently reliable and that a defendant has a fair opportunity to respond. Now, of course, Ms. Mendoza does not argue that the victim impact statements that were given at Mr. Hicks' hearing were not sufficiently reliable. And she certainly cannot argue that she did not have notice and an opportunity to rebut those statements. She was given a transcript of Mr. Hicks' sentencing in advance of her own sentencing and had fully the opportunity to review what the victims had said and then to respond to them at her own sentencing, and she declined that opportunity. The last thing I would like to focus on is the procedural reasonableness of Ms. Mendoza's sentencing. I think your honors don't have to get any further than acknowledging that even if the court's explanation did not permit a departure under guidelines paragraph 3B1.1, its evaluation of the 3553A factors unquestionably permitted a variance. And the court explicitly observed that absent a departure, quote, it would still vary upward for the same reasons and based on the need to reflect the seriousness of the offenses and Ms. Mendoza's role. So that ends the inquiry, regardless of whether it was error to depart upward under the guidelines. It certainly was not error for the court to have varied upward and the court explicitly said that it would do so and therefore any error was harmless. Unless your honors have any additional questions, I will rest on. Okay, thank you very much. Thank you. All right, we'll hear from Skelton, I guess. Thank you, your honor. I'll address the government's argument that any procedural error was harmless. In this case, that is not the case. What we have is sort of interlocking errors. The enhancement or the upward variance under 3B1.1 and the misapplication of the 3553 factors. All of these together exist to such a degree that we cannot say that this error was harmless. The government's argument is essentially that the judge said one sentence that he would impose the same sentence anyway. But what we saw is his reasoning under 3553 was double counting of 3553 factors. And 3B1.1 did not apply. The commentary to 3B1- Did he allude to any facts that were not what you would call double counting? Didn't he allude to the fact that these were personal encounters that deprived these people of money to their face, so to speak, and found that somewhat egregious? He did allude to that, your honor. And with respect to that statement, he said that a guideline statement would be, or excuse me, a guideline sentence would be appropriate because of course Ms. Mendoza's trial counsel had asked for a below guideline sentence. So when he, so he said exactly what you said and that was specifically tied to a guideline sentence would be appropriate as opposed to a downward variance. So his upward variance explanation simply is double counting and is a misunderstanding of 3B1.1 where she simply was using administrative manager, not managerial, administrative decision making that did not decide what to do with the funds. It was no, not present to any extraordinary degree. Thank you very much. All right, Mr. Burnham, you have some rebuttal? Thank you, your honor. Counsel for the government focused on the offense conduct, so I'll comment on that and on the trial defense. To the extent one could understand what Mr. Hick's defense was, I would summarize it as follows. That it was all real. That he really could help these people cancel their mortgages if they just followed his teaching. And we know from several sources that that wasn't just a story. He really believed it. We know that in at least two ways. One, in the Feretta hearing, we know that he paid money out of his pocket to a retained attorney, my predecessor counsel, to file discovery requests for some completely imaginary tax documents. He alleged were in the possession of the attorney general and that he thought would break his case wide open and show everybody that he was innocent. He really believed that and he said as much to Judge Chuang. Secondly, the expert report that I submitted as standby counsel at sentencing specifically said, in the opinion of Dr. Boss, he was not faking. He believed what he was doing was real. So powerful were his delusions. And that fact, which is really uncontested, has at least three hugely significant legal- Also during his defense, didn't he rely on the fact that his clients gave him powers of attorney to make decisions for them and he put in the consents that they signed and so forth? He very much did, your honor. I think that actually supports the point I'm trying to make. Well, it may support it, but the point is, it's a theory of trying to avoid liability and he had thought it out and he pursued it with questioning. And he really expected the jury to accept that and was genuinely surprised that they didn't. And the three consequences I think that leads us to is that if that's really true, he's incompetent, legally insane, and not guilty of fraud. There's no fraudulent intent. If he generally was so deluded, he thought he was doing something real. And finally, with five seconds, if I can take maybe 15 more seconds to conclude, it's been suggested a couple of times that Judge Chuang was in some sort of impossible position for which there were no good options. And I very much contend that there was an obvious and good option. Mr. Hicks could have been sent to FMC Butner. This happens all the time. He'd be treated there, very possibly put on medications that could help him. And folks, sometimes we've all seen it. If people get their proper medications, they turn into different people. That's what happened in the United States against Chapman, a case in this court that I was counsel in where for five years a defendant was incompetent. He got on meds, came to his sentence, pled guilty, accepted responsibility, and served his sentence, and the case was concluded. That could have happened here. That should have happened here. Thank you. Thank you. Ms. Skelton and Mr. Burnham, you're both court appointed, do I understand? I'd very much like to recognize that service. We don't overlook and take for granted how important it is to our system, and thank you very much for your good service in this case. We'll come down and greet counsel, and then we'll adjourn court sine die.
judges: Paul V. Niemeyer, Stephanie D. Thacker, Pamela A. Harris